**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x
**VOTERS FOR ANIMAL RIGHTS,**

                    **Plaintiff,**　　　　　　　**REPORT AND**
　　　　　　　　　　　　　　　　　　　　　　　　　**RECOMMENDATION**

            **-against-**　　　　　　　　　　　　　　**19-CV-6158 (MKB)**

**D'ARTAGNAN, INC., et al.**

                    **Defendants.**
-----------------------------------------------------------------x

**ROANNE L. MANN, UNITED STATES MAGISTRATE JUDGE:**

        Plaintiff Voters for Animal Rights ("VFAR" or "plaintiff"), a non-profit organization, brings this action against defendants D'Artagnan, Inc. and D'Artagnan, LLC (collectively, "D'Artagnan" or "defendants"), the largest distributor of foie gras in the United States, alleging that defendants engaged in deceptive marketing and false advertising practices in violation of sections 349 and 350 of New York's General Business Law.  See generally Complaint (Oct. 31, 2019) ("Compl."), Electronic Case Filing ("ECF") Docket Entry ("DE") #1.  Currently pending before this Court, on a referral from the Honorable Margo K. Brodie, is defendants' motion to dismiss the Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  See Letter Motion by Defendants D'Artagnan, Inc. and D'Artagnan, LLC, to Dismiss Complaint of Voters for Animal Rights under FRCP 12(b)(6) (Mar. 20, 2020) ("Def. Mot."), DE #21; Order Referring Motion (May 14, 2020).  For the reasons that follow, the Court recommends that defendants' motion to dismiss be granted in substantial part, and that the action be dismissed.

1

## BACKGROUND

The following facts are drawn from plaintiff's Complaint and are accepted as true for the purposes of this motion. Headquartered in the Eastern District of New York, VFAR is a 501(c)(4) non-profit organization that helps elect candidates who support animal protection, lobbies for laws to stop animal cruelty, and promotes the interests of citizens and consumers who support the humane treatment of animals. See Compl. ¶¶ 76-77. By way of example, VFAR avers that it represents and advances the rights and interests of animals by educating consumers, voters, and state and local representatives on animal cruelty, food safety, industrial agriculture, and environmental sustainability issues. See id. ¶ 79. With over 60,000 supporters who reside in New York State, "it is [also] one of the leading organizations working to ban the sale of foie gras in New York City, and the production of foie gras in New York State." Id. ¶¶ 77, 79.

D'Artagnan produces, processes, markets, distributes, and sells gourmet food products, including foie gras, across the United States. See id. ¶¶ 1, 74, 80. D'Artagnan markets and advertises its products throughout the State of New York, using search engine advertising, social media, and its company website and blog. See id. ¶ 7. Throughout its marketing and advertising materials, D'Artagnan makes representations regarding the well-being, treatment, care, handling, and living conditions of ducks used in the production of its foie gras products, and, in doing so, uses terms such as "humanely raised," "hand-feeding," "no stress," "never caged," "space to roam," and "natural behaviors." See id. ¶¶ 8, 100. In reality, the ducks used in creating D'Artagnan's foie gras products are force-fed in an inhumane manner that causes extreme suffering and disease, and are raised, fed, handled, and slaughtered in inhumane, crowded, and stressful conditions of confinement that prevent the expression of their natural behaviors. See id. ¶ 100. According to the pleading, these ducks are treated inhumanely, see id.

2

¶ 3, and, as a result, all representations by D'Artagnan to the contrary are false and materially misleading to consumers, see id. ¶¶ 4, 57-73.

The Complaint sets forth a number of ways in which VFAR has "suffered injury" in response to D'Artagnan's misrepresentations. See id. ¶ 84. Specifically, and as addressed in more detail therein, "plaintiff has expended its resources to counteract D'Artagnan's misrepresentations[,]" id., including, *inter alia*, through the following:

(1) Plaintiff has drafted and promoted online action alerts, email blasts, blog posts, and social media posts; created and distributed educational flyers; and conducted outreach to journalists;

(2) Plaintiff has spent hundreds of hours and thousands of dollars on assessing and refining its educational outreach efforts, on disseminating its materials, and on conducting a poll of New York voters;

(3) Plaintiff has had to expend resources on lobbying to ban the sale and production of foie gras, including the development of written advocacy materials as well as organizing, scheduling, traveling to, and attending meetings with elected officials and hearings with state and local legislative bodies. As a result, plaintiff has had to divert resources from its advocacy activities to litigation-related research and other efforts in anticipation of litigation regarding D'Artagnan's representations;

(4) Plaintiff mobilized over 5,000 supporters in New York City to engage directly in foie gras-related advocacy, through lobbying trainings, holding rallies, and encouraging them to take action from home by calling, emailing, and Tweeting at their elected officials and educating their friends and families on the inhumane production of foie gras.

See id. ¶¶ 85-88. In short, VFAR contends that "D'Artagnan's marketing representations have compelled and continue to compel [] VFAR to expend additional resources on education and advocacy, above and beyond that which [] VFAR would have expended in the absence of D'Artagnan's unlawful marketing scheme." Id. ¶ 89.

## PROCEDURAL HISTORY

Plaintiff commenced this action on October 31, 2019. See Compl. On December 26, 2019, defendants filed a letter-motion requesting a pre-motion conference in contemplation of

3

moving to dismiss, see Letter Motion for Pre-Motion Conference (Dec. 26, 2019), DE #16, and on January 6, 2020, plaintiff filed responsive papers, see Response to Request for Pre-Motion Conference (Jan. 6, 2020), DE #17.  Judge Brodie conducted a pre-motion conference with the parties on January 29, 2020, ultimately (1) giving plaintiff a week to decide whether it would "pursue its claim pursuant to section 350 of the New York General Business Law[,]" and (2) setting a briefing schedule "for defendants' motion regarding whether plaintiff has a cognizable injury under section 349 and[/]or section 350 of the General Business Law[.]"  Minute Entry (Jan. 30, 2020); see Transcript of Pre-Motion Conference (Mar. 20, 2020), DE #21-1.  Plaintiff timely notified the Court and defendants that it would be pursuing its claims under section 350. See Letter (Feb. 4, 2020), DE #18.

Defendants subsequently filed the pending letter-motion seeking a dismissal of plaintiff's Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure (the "FRCP"), see Def. Mot., and plaintiff submitted its opposition in a letter dated March 19, 2020, see Plaintiff's Memorandum in Opposition (Mar. 19, 2020) ("Pl. Opp."), DE #20.  After defendants replied, see Reply in Support of Motion to Dismiss (Mar. 20, 2020) ("Def. Reply"), DE #22, Judge Brodie referred the outstanding motion to dismiss to the undersigned magistrate judge for a report and recommendation, see Order Referring Motion (May 15, 2020).

## DISCUSSION

### I.     The Legal Standard Under Rule 12(b)(6)

In considering a motion to dismiss pursuant to Rule 12(b)(6) of the FRCP, a court must accept the complaint's factual allegations as true, and draw all reasonable inferences in favor of the plaintiff.  See, e.g., Sherman v. Town of Chester, 752 F.3d 554, 560 (2d Cir. 2014).  To survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is

4

plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007); accord Hayden v. Paterson, 594 F.3d 150, 160 (2d Cir. 2010). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009). A plaintiff need not allege "detailed or elaborate factual allegations, but only allegations sufficient to raise an entitlement to relief above the speculative level." Keiler v. Harlequin Enters. Ltd., 751 F.3d 64, 70 (2d Cir. 2014). Nevertheless, "a formulaic recitation of the elements of a cause of action will not do": the claim must set forth "more than labels and conclusions[.]" Twombly, 550 U.S. at 555.

## II.   The Injury Element of Sections 349 and 350

Section 349 of New York's General Business Law (the "GBL") prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." N.Y.G.B.L. § 349. Section 350, meanwhile, prohibits "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state." N.Y.G.B.L. § 350. To assert a claim under either section, "a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice." Orlander v. Staples, Inc., 802 F.3d 289, 300 (2d Cir. 2015) (quoting Koch v. Acker, Merrall & Condit Co., 18 N.Y.3d 940, 944 (2012)); see Wurtzburger v. Ky. Fried Chicken, 16-CV-08186 (NSR), 2017 WL 6416296, at *2 (S.D.N.Y. Dec. 13, 2017) ("A claim of false advertising under GBL § 350 must meet all of the same elements as a claim under GBL § 349.").

As a threshold matter, the parties do not dispute that the Complaint sufficiently pleads the first two elements required under sections 349 and 350 of the GBL. Rather, defendants argue

5

that plaintiff cannot satisfy the third element – the injury prong under these provisions – because (i) "plaintiff is neither a consumer nor a competitor (nor an organization representing consumers . . . or competitors . . .)[,]" and (ii) plaintiff's "alleged injury is 'derivative' of an alleged injury to consumers." Def. Mot. at 4.[1]

Specifically, defendants contend that plaintiff's purported injury – i.e., "the expenditure of resources to 'counteract' D'Artagnan's marketing to consumers" – does not satisfy the injury requirement because VFAR was "injured only to the extent that consumers [were] misled by D'Artagnan's advertising[.]" Def. Mot. at 4-5 (internal quotation marks omitted). In other words, VFAR's injury is "derivative" of consumers' exposure to defendants' misleading statements, and thus does not present a cognizable claim under either statutory provision. Plaintiff responds that it has alleged a cognizable injury under these provisions insofar as "the undermining of VFAR's advocacy occurred as a direct result of the alleged deceptive practices directed at consumers, [so] its injuries were not solely as a result of injuries sustained by another party." Pl. Opp. at 4 (citation and internal quotation marks omitted).

1. **The Legislative History of the GBL Provisions**

As an initial matter, the text of both provisions – sections 349(h) and 350-e(3) – provides a private cause of action for "any person who has been injured by reason of any violation" of that section. N.Y.G.B.L. §§ 349(h), 350-e(3). A plain reading of the text of each statute neither explains what kinds of injuries are actionable under these provisions, nor what constitutes "any

---

[1] Defendants also argue that section 350 requires a plaintiff to demonstrate reliance on a defendant's false advertising, which VFAR cannot do in this case. See Def. Mot. at 9-10. Having concluded that VFAR does not allege a cognizable injury under section 349 or 350, this Court does not address D'Artagnan's reliance argument, but stands ready to do so in the event that the District Court reaches a different conclusion with respect to the injury requirement.

6

person" under the same. Therefore, this Court must begin its inquiry by examining the legislative history surrounding the simultaneous enactment of sections 349(h) and 350-e(3).[2] See United States v. Desposito, 704 F.3d 221, 226 (2d Cir. 2013) ("We will resort to legislative history . . . only if we conclude that the text is ambiguous."); cf. Bostock v. Clayton Cty., Ga., 140 S.Ct. 1731, 1749 (2020) ("Of course, some Members of this Court have consulted legislative history when interpreting *ambiguous* statutory language . . . [but] no ambiguity exists [here].") (emphasis in original).

"When General Business Law § 349 was enacted in 1970, only the Attorney General was empowered to enforce it[.]" N. State Autobahn, Inc. v. Progressive Ins. Grp. Co., 953 N.Y.S.2d 96, 103 (2012) (citation omitted). In 1980, after it became apparent that the Attorney General could provide only minimal enforcement, the New York State Legislature amended the statute to create a private right of action. See id. at 103-04. That amendment was "intended to afford additional protection for consumers, allowing them to bring suit on their own behalf without relying on the Attorney General for enforcement[.]" Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris USA Inc., 3 N.Y.3d 200, 205 (2004) (citation omitted) (hereafter, referred to as "Blue Cross"); see City of N.Y. v. Smokes-Spirits.com, Inc., 12 N.Y.3d 616, 621 (2009) (hereafter, referred to as "Smokes-Spirits") ("The purpose of this amendment was to expand enforcement authority beyond the Attorney General and thereby ensure more optimal protection of the public[.]").

---

[2] In 1989, section 350-d of the GBL was renumbered to become section 350-e. See Princeton Graphics Operating, L.P. v. NEC Home Elecs. (U.S.A.), Inc., 732 F.Supp.1258, 1266 (S.D.N.Y. 1990). To the extent that the legislative history referenced herein discusses section 350-d of the GBL, it is, in fact, referring to the private cause of action provision now found at section 350-e(3).

7

This Court's independent review of the legislative history surrounding the creation of these private causes of action suggests that the type of injury that plaintiff now complains of was not contemplated when sections 349(h) and 350-e(3) were enacted approximately forty years ago. Statements made in support of and against the passage of the proposed amendments show that legislators intended for individual consumers to use the private right of action on their own behalf. For example, New York Governor Hugh L. Carey proclaimed in his signing statement that "[t]his bill, by authorizing private actions . . . will encourage private enforcement of these consumer protection statutes . . . and grant[s] individuals the right to sue for injuries resulting from consumer fraud."  Signing Statement by Governor Hugh L. Carey, Bill Jacket for ch. 346 of 1980 N.Y. Laws.[3]  Other lawmakers and policymakers made similar statements.  See, e.g., Letter from Joseph L. Bruno, Bill Jacket for ch. 246 of 1980 N.Y. Laws ("This bill is designed to give the individual consumer the right to seek judicial redress for injury incurred by reason of a violation of Section 349 of the General Business Law."); Governor's Program Bill Memorandum, Bill Jacket for ch. 246 of 1980 N.Y. Laws ("The bill permits individuals who are aggrieved by these acts or practices to sue for damages[.]").  These provisions also contemplated a cause of action for businesses to sue competitors engaged in deceptive practices.  See Attorney General Robert Abrams's [First] Memorandum for the Governor, Bill Jacket for ch. 346 of 1980 N.Y. Laws ("The bill [amending section 350 of the General Business Law] will be particularly useful to businesses who believe that they are victims of unfair competition through false advertising of competitors. They will be able to take prompt legal action to resolve the issues.").

---

[3] Neither VFAR nor D'Artagnan referenced the legislative history in their motion papers, nor did either attach excerpts of the "bill jacket" compiled by the New York Legislative Service, Inc.  Because that compilation lacks any form of consecutive pagination, this Court cannot cite to the page numbers of specific documents within the bill jacket.

Much of the debate surrounding these amendments involved consumers' capacity to bring class action suits based on deceptive business practices and false advertising. Compare, e.g., Letter from Gene DeSantis, Bill Jacket for ch. 346 of 1980 N.Y. Laws ("It is a matter of statutory construction that, since our bills are silent as to class actions, the language in CPLR Article 9 controls [which] permits class actions by consumers."), with Letter from Jose E. Serrano, Bill Jacket for ch. 346 of 1980 N.Y. Laws ("[T]his bill differs from a bill passed by the Assembly earlier this session . . . which specifically authorized class action suits."). Despite dozens of statements from legislators, civil servants, and business and community members regarding the proposed amendment, as well as news articles involving the same, this Court finds nothing in the legislative history of sections 349(h) and 350-e(3) to suggest that lawsuits involving injuries such as those claimed herein were contemplated when the Legislature created these private causes of action.

Crucially, lawmakers made manifest their intent to establish clear limits so as to preclude a deluge of lawsuits under these new provisions. For example, "in explicating the legislative objective behind section 349," the New York Court of Appeals opined that "the potential for a tidal wave of litigation against businesses [] was not intended by the Legislature." Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A., 85 N.Y.2d 20, 26 (1995) (assessing section 349(h)'s legislative history); see also Blue Cross, 3 N.Y.3d at 207 (noting the same). According to New York Attorney General Abrams's Memoranda recommending passage of the amendments to sections 349 and 350, "fears of a plethora of litigation [were] unfounded." Abrams's [First] Memorandum for the Governor (regarding section 350); see also Abrams's

9

[Second] Memorandum for the Governor (regarding section 349).[4]

Because the legislative history demonstrates a concerted effort to limit the scope of the provisions governing private causes of action, courts should be reluctant to embrace a broad interpretation of what constitutes a cognizable "injury" under sections 349 and 350 of the GBL.

### 2. The Nature of Plaintiff's Injury

In arguing that VFAR has not asserted a cognizable injury under sections 349 and 350, D'Artagnan principally relies on two leading New York Court of Appeals cases: (1) Blue Cross and (2) Smokes-Spirits. In Blue Cross, a health insurer filed suit against the defendant cigarette manufacturers, alleging these manufacturers violated section 349 insofar as: "(1) the cigarette manufacturers engaged in deceptive practices by not revealing the harmful effects of smoking, and (2) as a result . . . , people smoked, (3) got sick, and, therefore, (4) the insurance companies' costs increased." M.V.B. Collision, Inc. v. Allstate Ins. Co., 728 F.Supp.2d 205, 216-17 (E.D.N.Y. 2010) (Bianco, J.) (summarizing Blue Cross). On certification of the issue from the Second Circuit, the New York Court of Appeals addressed the defense argument that the insurer's claims were too remote to be cognizable, noting that while "section 349 is a broad, remedial statute [] that [] employs expansive language[,]" the Legislature did not intend to permit recovery for those suffering from "derivative" or "indirect" injuries – to wit, those occurring "solely as a result of injuries sustained by another party." Blue Cross, 3 N.Y.3d at 207. The insurer's

---

[4] The practice commentary relating to sections 349 and 350, authored by Richard A. Givens, a former regional director of the FTC, advocates for "[c]ommon sense . . . in deciding when the statute would have been intended to apply[,]" Richard A. Givens, Practice Commentaries, N.Y.G.B.L. § 349 (McKinney 2004) at 573, and urges that these sections be "[c]onfined to their proper orbits," id. at 575. Although McKinney's publication no longer includes Mr. Givens' Commentary in its published compilations (the 2004 edition being the most recent edition to include it), the New York Court of Appeals' continued approval of the Commentary means that it should be viewed as persuasive authority in considering how the Court of Appeals would interpret these provisions. See Mayes v. Summit Ent't Corp., 287 F.Supp.3d 200, 208 n.4 (E.D.N.Y. 2018).

10

injuries, according to the New York Court of Appeals, were indirect because "the losses it experienced arose wholly as a result of smoking related illnesses suffered by those subscribers." Id.

The second case upon which defendants rely is Smokes-Spirits. There, the City of New York brought suit under section 349 against cigarette retailers, alleging, *inter alia*, that the defendants engaged in deceptive practices by misrepresenting to New York consumers that their cigarette sales were "tax free." See Smokes-Spirits, 12 N.Y.3d at 620. Based on those inaccurate statements, New York City alleged that consumers who purchased cigarettes from these retailers failed to pay the required excise taxes, resulting in lost revenue to the City. See id. at 619-20. Again on certification from the Second Circuit, the New York Court of Appeals concluded that the City could not assert a section 349 claim because "[t]he City's claimed injury . . . [was too] indirect" and "[a]lthough in some sense the City's injuries are 'caused' by defendants' alleged conduct, this Court has required more than an allegation of 'but for' cause to state a claim for relief under section 349(h)[.]" Id. at 622-23 ("[B]ecause [the City's] claimed injury, in the form of lost tax revenue, is entirely derivative of injuries that it alleges were suffered by misled consumers who purchased . . . cigarettes over the Internet[,]" the City could not maintain its claim against these cigarette retailers.).[5]

Defendants rely on both of these cases in arguing that VFAR's purported injury, i.e., having to expend resources to counteract D'Artagnan's misrepresentations, is similarly derivative

---

[5] Both Smokes-Spirits and Blue Cross refer to the respective plaintiffs' lack of a cognizable injury under section 349 as an issue of "standing." Because defendants herein do not move to dismiss the instant suit for lack of Article III standing, and since the issue of "standing" in the Court of Appeals opinions involves an analysis of what constitutes a viable "cause of action," this Court eschews the use of the term "standing" and instead characterizes the lack of a cognizable injury as a failure to establish a required element of a claim under the GBL. See Def. Mot. at 1 n.1.

11

of any injuries suffered by consumers who were misled by those misrepresentations. See Def. Mot. at 6. Plaintiffs counter that the aforesaid cases are not directly on point because the "VFAR is injured as soon as consumers are misled (and support for VFAR's work is decreased), even if [those consumers] do not act on that misinformation by purchasing D'Artagnan's foie gras." Pl. Opp. at 4.

While neither Blue Cross nor Smokes-Spirits involves a set of facts substantially similar to those at issue in the case at bar, the rationale of each of those decisions strongly suggests that plaintiff has failed to assert an injury that is sufficiently direct to satisfy sections 349 and 350 of the GBL. Blue Cross and Smokes-Spirits extensively discuss section 349(h)'s prohibition against recovery for a plaintiff's "derivative injuries," explaining that "[a]n injury is indirect or derivative when the loss arises solely as a result of injuries sustained by another party." Blue Cross, 3 N.Y.3d at 207. Thus, this Court must determine whether plaintiff's injuries (VFAR's purported expenditures to counteract D'Artagnan's misleading statements) arise solely as a result of injuries sustained by consumers (foie gras customers in New York State).

VFAR, an organization dedicated to banning the sale and production of foie gras, see Compl. ¶¶ 79, 83, rests its theory of liability on the assumption that defendants' false advertising harmed plaintiff's educational efforts, prompting it to spend additional resources to counteract the resulting consumer-held misinformation. VFAR's expenditures were made specifically to neutralize the impact on consumers who were misled by defendants' false and misleading advertisements, which "decreased the effectiveness of [] VFAR's efforts to reduce foie gras consumption[.]" Id. ¶ 81. According to VFAR, "[r]esearch commissioned by the foie gras industry specifically shows that consumers who support a ban on foie gras production may *change* their views, to oppose such legislation, once they are exposed to misleading pro-industry

12

messaging[.]" Pl. Opp. at 3 (citing Compl. ¶ 83) (emphasis in original). Thus, the Complaint alleges VFAR "spent hundreds of hours and thousands of dollars" in "order to correct public consumer perceptions that were manipulated by [the] false narrative of humane treatment spread by D'Artagnan[,]" id. ¶ 86, and "D'Artagnan's successful 'humane' marketing scheme . . . compelled [] VFAR to expend resources on lobbying to ban the sale and production of foie gras, which exists largely as a result of D'Artagnan's marketing efforts[,]" id. ¶ 87. But as defendants correctly hypothesize, "if D'Artagnan were not reaching any consumers with its advertising, then VFAR would not feel compelled to 'expend resources' attempting to dissuade those consumers from purchasing foie gras." Def. Mot. at 6. VFAR's injury is thus derivative of the injury to consumers, and it is no answer to argue, as plaintiff does, that plaintiff suffered its injury "at the same time the deceptive act occurred[,]" Pl. Opp. at 4 (citation omitted); as articulated in plaintiff's own pleading, VFAR's expenditures were predicated on its assumption that D'Artagnan's advertisements would mislead – and therefore injure – the consuming public. See, e.g., Def. Reply at 5 ("*But for* consumers' [sic] allegedly being misled by D'Artagnan, VFAR has no injury.") (emphasis in original).

VFAR vainly attempts to distinguish between "injuries resulting from consumer *deception*" and those "resulting solely from consumer *injury*," arguing that the injuries suffered by VFAR, in contrast to those in Blue Cross and Smokes-Spirits, are independent of any consumer injuries. See Pl. Opp. at 4-5 (emphasis in original). VFAR mistakenly relies on Casper Sleep, Inc. v. Mitcham, 16 Civ. 3224 (JSR), 2016 WL 7188788 (S.D.N.Y. Nov. 14, 2016), which involved a completely distinguishable set of facts involving business-on-business

13

competition. There, the court opined in dictum[6] that even if the misleading statements made by the defendant mattress retailer did not cause consumers to purchase the defendant's mattresses, Casper, a competitor, nevertheless suffered a cognizable injury, in that consumer-purchasers were thereby dissuaded from buying Casper mattresses. See Casper Sleep, 2016 WL 7188788, at *2 & n.2. But the injury alleged in the case at bar – expenditures that VFAR opted to make – bears no resemblance to the "diversion of trade" injury in Casper Sleep, where the deception of consumers directly caused the plaintiff to suffer a loss, whatever the plaintiff's response to that deception. As discussed above, the drafters of section 349(h) and 350-e(3)'s private causes of action contemplated injuries to businesses that were analogous to those set forth in Casper Sleep. See *supra* p. 8. Here, in contrast, "VFAR does not allege that it sells anything, let alone a competing product." Def. Reply at 3. Therefore, to the extent that consumer deception can give rise to a cognizable injury to a non-consumer plaintiff, VFAR has offered no case law (or legislative history) to support a conclusion that such an injury is actionable outside the business-on-business context, particularly where, as here, the asserted injury consists of voluntary expenditures made by plaintiff to address the impact of defendants' advertisements on consumers.

To adopt plaintiff's reasoning would invite a "tidal wave of litigation," contrary to the express desires and expectations of those involved in the creation of the statutes' private rights of action. Although VFAR is correct that, to date, no judicial opinion uncovered by the parties or the Court has involved similar factual circumstances, see Pl. Opp. at 5, the type of injury alleged in the instant Complaint is not exclusive to plaintiff or the foie gras industry. If an advocacy organization could satisfy the injury prongs of sections 349 and 350 simply by expending

---

[6] The opinion addressed the merits after first holding that the defendants' newly asserted argument was "not cognizable on a motion for reconsideration." Casper Sleep, 2016 WL 7188788, at *1.

14

additional resources to counteract any purportedly misleading statements made by a seller or service provider, courts could anticipate a deluge of analogous lawsuits.  See Def. Reply at 5 ("If a[n] advocacy organization . . . were found to be 'injured' any time it encountered allegedly false statements made by businesses touting the virtues of their own products or services – . . . whether they be foie gras or fake turkey, trigger locks or guns, vaccines or even abortions – then the advocacy group could drag that business into costly litigation merely because it refuses to believe what the sellers say about their own products or services.").  Plaintiff's argument, if adopted, would recognize a cognizable injury to any organization that opts to spend its resources persuading consumers to boycott a product or service.

       To be sure, some courts interpreting section 349's private right of action provision have framed the issue in terms of what kinds of "persons" can bring suit pursuant to the statute.  See, e.g., Silvercorp Metals Inc. v. Anthion Mgmt. LLC, 36 Misc.3d 1231(A), 2012 WL 3569952, at *15, 959 N.Y.S.2d 92 (Table) (N.Y. Sup. Ct. Aug. 16, 2012) ("And, while 'any person' may pursue a GBL 349 claim [according to the text of the statute], 'any person' has been limited to typical consumer and business competitors, and Silvercorp is neither a consumer nor business competitor of defendants or defendants' services[.]").  For example, as then District Judge Bianco observed in M.V.B. Collision, section 349 is not limited to "*only* consumers and [business] competitors [because] the plain text of the statute allows '*any person* who has been injured by reason of any violation of this section' to bring suit."  728 F.Supp.2d at 218-19 (emphasis in original).  But while plaintiff is right to focus on the nature of the claim asserted rather than on the status of the plaintiff, see Pl. Opp. at 4 (citation omitted), the question before this Court is not whether a non-profit, advocacy, or lobbying organization is *per se* precluded

15

from bringing suit under either of these provisions, regardless of the nature of the alleged injury.[7] Rather, the Court's conclusion that plaintiff has not asserted a cognizable injury is predicated on the precise harms to VFAR alleged in the Complaint.

### 3. Additional Cases Cited by VFAR

None of the remaining cases cited by plaintiff involves similar factual predicates or is sufficiently analogous so as to persuade this Court that plaintiff has a viable injury under sections 349 and 350 of the GBL. As an initial matter, a number of plaintiff's cases involve deceptive practices that generated injuries to competing businesses, see, e.g., M.V.B. Collision, 728 F.Supp.2d at 205; N. State Autobahn, 953 N.Y.S. at 96 – a type of injury expressly contemplated by the drafters of the provisions' private causes of action. Similarly unavailing is VFAR's reliance on cases that involve issues of representational standing,[8] see N.Y. Pub. Interest Research Grp., Inc. v. Ins. Info. Inst., 531 N.Y.S.2d 1002 (Sup. Ct. N.Y. Co. 1988), or on out-of-Circuit cases not involving sections 349 and 350 of the GBL, see Spann v. Colonial Vill., Inc., 899 F.2d 24 (D.C. Cir. 1990) (Ginsburg, J.); Animal Legal Def. Fund v. HVFG LLC, No. C 12-05809, 2013 WL 3242244 (N.D. Cal. June 25, 2013).

Plaintiff also cites a recent New York lower court decision in *In re* Opioid Litigation for the proposition that "even after Blue Cross and Smokes-Spirits, New York courts have held that non-competitor plaintiffs suffered cognizable injuries under § 349 when misleading

---

[7] Plaintiff does not purport to be suing in a representational capacity on behalf of any member of VFAR who has been misled by defendants' representations. See *infra* n.8.

[8] According to the Second Circuit, representational (or associational) standing permits an organization to sue on behalf of its members, in which case the entity must show, *inter alia*, "that some particular members of the organization would have standing to bring the suit individually." N.Y. Civil Liberties Union v. N.Y.C. Transit Auth., 684 F.3d 286, 294 (2d Cir. 2012) (citations omitted).

16

advertisements 'forced the plaintiffs to allocate substantial resources' to counteract the harmful effects of misleading marketing." Pl. Opp. at 5 (citing *In re* Opioid Litig., 400000/2017, 2018 N.Y. Misc. LEXIS 2428 (Sup. Ct., Suffolk Cnty. June 18, 2018)). In those consolidated cases, multiple plaintiff counties within the State of New York commenced lawsuits against various pharmaceutical manufacturers and distributors for, *inter alia*, harm caused by false and misleading marketing campaigns relating to opioids. See id. at *4. Assessing the injury prong under section 349, the court found that the plaintiffs adequately "alleged that the manufacturer defendants' deceptive marketing campaigns created a public health crisis within the plaintiff counties, leading to substantial increases in opioid addiction, abuse, overdose and death among residents[.]" Id. at *73. Although the Opioid court recognized that, in certain circumstances, the allocation of resources may satisfy the injury element of section 349, see id., the opinion did not elaborate on its departure from Blue Cross, nor does VFAR address the stark factual dissimilarities between the Opioid case and the case at bar. That one lower opinion, which involved a host of injuries to the plaintiff counties, does not provide a persuasive basis for concluding that VFAR has a viable cause of action, in the face of legislative history and Court of Appeals decisions counseling otherwise.

Accordingly, having concluded that VFAR failed to assert a viable injury under sections 349 and 350 of New York's GBL, this Court recommends that defendants' motion to dismiss be granted.[9]

---

[9] Apparently recognizing its inability to improve upon its current pleading, VFAR does not seek leave to amend its Complaint. Accordingly, given the futility of any attempt to plead a cognizable injury, the Court should not, *sua sponte*, afford VFAR the opportunity to amend. See Def. Mot. at 11.

17

## CONCLUSION

For the foregoing reasons, the Court respectfully recommends that defendants' motion to dismiss under Rule 12(b)(6) of the FRCP be granted in substantial part (i.e., on the ground that plaintiff fails to state a cognizable injury), and that this action be dismissed on that basis.

Any objection to the recommendations contained herein must be filed with Judge Brodie on or before **July 29, 2020**. Failure to file objections in a timely manner may waive a right to appeal the District Court order. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989) (per curiam).

**SO ORDERED.**

**Dated:** **Brooklyn, New York**
**July 15, 2020**

/s/ *Roanne L. Mann*

**ROANNE L. MANN**
**UNITED STATES MAGISTRATE JUDGE**